UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| TORE HEINZ MARKUS JAGRELIUS, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| NAVIENT CORPORATION, JOHN F. REMONDI and SOMSAK CHIVAVIBUL, | |
| Defendants. | JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Navient Corporation ("Navient" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the publicly-traded securities of Navient between April 17, 2014 and December 28, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.

4.      Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District.

5.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## PARTIES

6.      Plaintiff Tore Heinz Markus Jagrelius, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly-traded securities of Navient during the Class Period and has been damaged thereby.

7.      Defendant Navient, headquartered in Wilmington, Delaware, is the nation's largest loan servicer, servicing more than $300 billion in student loans.  Navient common stock trades on the NASDAQ, an efficient market, under the ticker symbol "NAVI."  As of March 31, 2015, the Company had more than 389 million shares issued and outstanding.  The Company also has publicly traded debt which trades under various ticker symbols in efficient markets on the NASDAQ.

8.      Defendant John F. Remondi a/k/a Jack Remondi ("Remondi") is and has, during all relevant times, served as Navient's President, Chief Executive Officer ("CEO"), Director and member of the Navient Board of Directors' Executive Committee.

9.      Defendant Somsak Chivavibul ("Chivavibul") is and has, during all relevant times, served as Navient's Executive Vice President and Chief Financial Officer ("CFO").

10.     Defendants Remondi and Chivavibul are collectively referred to herein as the "Individual Defendants."

11.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Navient, were privy to confidential and proprietary information concerning Navient, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Navient, as discussed in detail below. Because of their positions with Navient, the Individual Defendants had access to non-public information about its businesses, finances, products, markets and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Navient's business.

13.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of Navient's reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose publicly-traded securities were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Navient's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Navient publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of Navient publicly-traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Navient's business,

operations and management and the intrinsic value of Navient securities; (ii) enabled Navient insiders, including the Individual Defendants, to sell more than $1.3 million of their personally held Navient publicly-traded securities to unsuspecting investors at fraud-inflated prices; (iii) facilitated Navient selling $1.5 billion in debt in registered offerings at prices more favorable to Navient than would have been available had the true state of its financial affairs been disclosed; and (iv) caused Plaintiff and other members of the Class to purchase Navient publicly-traded securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the publicly-traded securities of Navient during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

17.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Navient publicly-traded securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Navient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Navient;

(c)     whether the price of Navient publicly-traded securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

22.     On May 29, 2013, SLM Corporation ("Sallie Mae") announced it would separate into two distinct publicly-traded entities — an education loan management business ("Navient") and a consumer banking business ("SLM BankCo").  The separation would be effected through the distribution of the common stock of Navient, which was formed to hold the assets and liabilities associated with Sallie Mae's education loan management business (the "Spin-Off").  All of the existing secured and unsecured debt of Sallie Mae would become the obligations of Navient.

23.     On April 10, 2014 the Sallie Mae Board of Directors approved the Spin-Off and on April 17, 2014, Navient's stock began trading on the NASDAQ on a "when-issued" basis.  On April 30, 2014 the Spin-Off was completed *via* a distribution by Sallie Mae of all the shares of common stock of Navient to the shareholders of Sallie Mae common stock, on a one-to-one basis, as of the close of business on April 22, 2014.  On May 1, 2014, Navient's common stock began trading on the NASDAQ "regular way."

24.     At the time of the Spin-off, Navient was servicing more than $300 billion in student loans for more than 12 million borrowers.  Navient holds the largest portfolio of education loans insured or guaranteed under the Federal Family Education Loan Program ("FFELP"), as well as the largest portfolio of Private Education Loans.  FFELP Loans are insured or guaranteed by state or not-for-profit agencies based on guaranty agreements among the United States Department of Education (the "ED") and these agencies.  Private Education Loans are education loans to students or their families that bear the full credit risk of the customer and any cosigner.  Private Education Loans are made primarily to bridge the gap between the cost of higher education and the amount funded through financial aid, federal loans or students' and families' resources.

25.     Navient services its own portfolio of education loans, as well as those owned by banks, credit unions, non-profit education lenders and the ED.  Navient is one of four large servicers to the ED under its Direct Student Loan Program ("DSLP").  Navient also provides asset recovery services on its own portfolio (consisting of both education loans as well as other asset classes), guaranty agencies, higher education institutions, the ED and other federal clients, as well as states, courts, and municipalities.

26.     Navient operates in four operating segments: FFELP Loans, Private Education Loans, Business Services, and Other.

27.     During the Class Period, the Company's operating results were primarily driven by net interest income from its student loan portfolios, provision for loan losses, the revenues and expenses generated by its servicing and asset recovery businesses, and gains and losses on subsidiary sales, loan sales and debt repurchases, though Navient's primary source of revenue was interest income it received on its loan portfolio.

28.     In preparation for the Spin-Off, on April 10, 2014, Sallie Mae filed a final amendment to Navient's registration statement with the SEC to be used to conduct the Spin-Off. The April 10, 2014 filing contained an Information Statement to be used by investors in valuing Navient's publicly-traded securities.  The Information Statement stated in pertinent part as follows concerning the Company's business metrics, financial prospects, loan quality and the adequacy of Navient's loan loss reserves:

### Navient's Strengths

Navient will possess a number of competitive advantages that will distinguish it from its competitors, including:

***Premier servicing market share and infrastructure well-positioned for evolving marketplace***.  Navient will be the largest servicer of education loans.  It will also provide account maintenance, default aversion, post default collections and claim processing to 15 of the 30 guaranty agencies that serve as an intermediary between the U.S. federal government and FFELP lenders, and are responsible for paying the

claims made on defaulted loans. Navient's premier market share and tested servicing and collections infrastructure make it well-positioned to expand its servicing and collections businesses to additional third-party FFELP, federal, private education and other loan portfolios.

***Navient will have substantial institutional knowledge and expertise in student loan assets and finance markets***. Sallie Mae was a pioneer in the student loan-backed securitization market and Navient will continue as the largest participant in this market. Navient will have established relationships with institutions that underwrite and invest in such securities and years of historical data to use in estimating loan default rates and expected cash flows.

***Strong cash flow generation with ample debt service coverage***. Navient will own the single largest portfolio of FFELP Loans. This portfolio generates steady cash flows, as FFELP lenders generally bear a maximum three percent loss exposure due to the guarantee under FFELP. Navient will also own the largest portfolio of Private Education Loans, which bear the full credit risk of the borrower and cosigner. Navient expects that cash flows from its FFELP Loan and Private Education Loan portfolios will significantly exceed future debt service obligations. Navient also expects it will be able to continue Existing SLM's policy of returning capital to stockholders through dividends and share repurchases, subject to limitations under a tax sharing agreement with SLM BankCo. See "Capital Return Policies."

***Servicing platforms that offer substantial economies of scale***. Existing SLM has internally developed and purchased technology platforms, which will be owned by Navient. Navient will service and collect on DSLP loans for ED, on FFELP Loans for guarantor and other clients and on its own $103.2 billion portfolio of FFELP Loans and $31.0 billion portfolio of Private Education Loans (on a pro forma basis, as of December 31, 2013). These platforms are robust and scalable and will enable Navient to add additional accounts at low cost.

\*       \*       \*

### Provisions for Loan Losses

Management estimates and maintains an allowance for loan losses at a level sufficient to cover charge-offs expected over the next two years, plus an additional allowance to cover life-of-loan expected losses for loans classified as a troubled debt restructuring ("TDR"). The provision for loan losses increases the related allowance for loan losses. ***Generally, the allowance for loan losses rises when charge-offs are expected to increase and falls when charge-offs are expected to decline***. Our loss exposure and resulting provision for losses is small for FFELP Loans because we generally bear a maximum of three percent loss exposure on them. We bear the full credit exposure on our Private Education Loans. Our provision for losses in our FFELP Loans segment was $52 million in 2013 compared with $72 million in 2012. Losses in our Consumer Lending segment are determined by risk characteristics such as school type, loan status (in-school, grace, forbearance, repayment and delinquency), loan seasoning (number of months in active repayment), underwriting criteria (e.g., credit scores), a cosigner and the current economic environment. ***Our provision for loan losses in our Consumer Lending segment was $787 million in 2013 compared with $1.0 billion in 2012***.

### Charge-Offs and Delinquencies

When we conclude a loan is uncollectible, the unrecoverable portion of the loan is charged against the allowance for loan losses in the applicable segment. ***Charge-off data provides relevant information with respect to the performance of our loan portfolios***. Management focuses on delinquencies as well as the progression of loans from early to late stage delinquency. The Consumer Lending segment's charge-off rate was 2.8 percent of loans in repayment in 2013 compared with 3.4 percent of loans in repayment in 2012. Delinquencies are a very important indicator of potential future credit performance. ***Private Education Loan delinquencies as a percentage of Private Education Loans in repayment decreased from 9.3 percent at December 31, 2012 to 8.3 percent at December 31, 2013***.

<div align="center">*    *    *</div>

***Risk Management Roles and Responsibilities***

<div align="center">*    *    *</div>

Loan Loss Reserve Committee. ***Our Loan Loss Reserve Committee will oversee the sufficiency of our loan loss reserves and will consider current or emerging issues affecting delinquency and default trends which may result in adjustments in our allowances for loan losses***.

29.     The statements made by Navient in the Information Statement remained alive and uncorrected in the market throughout the Class Period and the Company continued referring back to them.

30.     The Class Period starts on April 17, 2014 when Navient common stock began trading on the NASDAQ. On April 16, 2014, Navient, then part of Sallie Mae, issued a press release announcing its financial results for its first quarter 2014 ended March 31, 2014 ("1Q14"). The caption of the release emphasized: "***Private Education Loan Charge-off Rates Down from the Year-Ago Quarter to 2.8 Percent***," "***Private Education Loan 90-Day Delinquency Rate Drops to 3.4 Percent, Lowest Level Since 2008***," that "***Navient's Separation [was] on Track for April 30, 2014***," with the body of the release stating that "Core earnings for the quarter were $227 million ($0.51 diluted earnings per share), compared with $283 million ($0.61 diluted earnings per share) for the year-ago quarter."[1] The release quoted Defendant Remondi stating in pertinent part as follows:

---

[1]     Unless otherwise noted, all emphasis is added.

This is an exciting time for our company as we prepare for our first day of trading as Navient and Sallie Mae. Throughout the process, our dedicated employees remained fully focused on creating a smooth transition for our customers to help them maximize their investment in higher education and progress on the road to financial success. *We're also pleased that this quarter set a six-year-record low in delinquencies, reflecting our strong underwriting and customer support.*"

31.     Addressing the purported ongoing strength in the Company's Consumer Lending

segment, the release stated in pertinent part as follows:

Quarterly core earnings were $118 million, compared with $87 million in the year-ago quarter. *The increase is primarily the result of a $50 million decrease in the provision for private education loan losses.*

First-quarter 2014 private education loan portfolio results vs. first-quarter 2013 included:

- Loan originations of $1.5 billion, up 8 percent.

- *Delinquencies of 90 days or more of 3.4 percent of loans in repayment, down from 3.9 percent.*

- *Total delinquencies of 6.9 percent of loans in repayment, down from 7.8 percent.*

- Loans in forbearance of 3.7 percent of loans in repayment and forbearance, up from 3.4 percent.

- *Annualized charge-off rate of 2.8 percent of average loans in repayment, down from 3.0 percent.*

- *Provision for private education loan losses of $175 million, down from $225 million.*

- *Core net interest margin, before loan loss provision, of 4.34 percent, up from 4.15 percent.*

- The portfolio balance, *net of loan loss allowance*, was $38.2 billion, up 2 percent.

---

Navient reports a "Core earnings" financial metric that is not reported in accordance with Generally Accepted Accounting Principles ("GAAP"). Due to the relative significance of Navient to the SLM Corporation prior to the spin-off ("old SLM"), for financial reporting purposes Navient treats itself as the "accounting spinnor" and therefore the "accounting successor" to old SLM, notwithstanding the legal form of the spin-off. As such, the historical financial statements of old SLM prior to April 30, 2014 are the historical financial statements of Navient, including the consolidated results of both the loan management, servicing and asset recovery business (Navient) and the consumer banking business (SLM BankCo). Purportedly to allow investors to evaluate Navient's distinct financial results (separate from those of SLM BankCo) post spin-off, Navient's reported "Core earnings" excludes unrealized mark-to-market adjustments on derivatives, the amortization of goodwill and intangible assets, the results of the consumer banking prior to the spin-off, and the related restructuring and reorganization expenses.

32.     The release also discussed the capacity of the Company's secured credit facilities. In this regard, the release stated, in pertinent part, that:

> As of March 31, 2014, December 31, 2013 and March 31, 2013, the maximum additional capacity under these facilities was $12.7 billion, $10.6 billion and $9.8 billion, respectively.  For the three months ended March 31, 2014, December 31, 2013 and March 31, 2013, the average maximum additional capacity under these facilities was $12.3 billion, $11.1 billion and $10.8 billion, respectively.

33.     On April 16, 2014, Navient, then part of Sallie Mae, held a conference call with investors and provided additional positive commentary about the Company's then-present business metrics, including the purported strong performance of its Private Education Loan segment that justified the reduction in the loan loss provision, with Defendant Remondi stating in pertinent part as follows:

> *We saw 90-day delinquencies fall to 3.4% from 4.1% at year end and 3.9% a year ago*.  And as Joe said charge-offs fell to an annualized rate of 2.8%.  *As a result we are able to lower our provision for future loan losses to $175 million down from $225 million in the year ago quarter*.

34.     On April 30, 2014 the Spin-Off was completed and Navient stock began trading regularly on the NASDAQ.

35.     On May 9, 2014, Navient filed a Quarterly Financial Report on Form 10-Q with the SEC for the interim period ended March 31, 2014 (the "1Q14 10-Q"), which was signed by Defendant Chivavibul and certified pursuant to the Sarbanes Oxley Act of 2012 by Defendants Remondi and Chivavibul.  The 1Q14 10-Q reiterated the financial results reported on April 16, 2014 and provided the following additional disclosures concerning the adequacy of Navient's "Allowance for Loan Losses" and legal compliance:

> *Our provisions for loan losses represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios*.  The evaluation of the provisions for loan losses is inherently subjective as it requires material estimates that may be susceptible to significant changes.  *We believe that the allowance for loan losses is appropriate to cover probable losses incurred in the loan portfolios*.

<p align="center">*     *     *</p>

> *Navient prides itself in a robust compliance culture driven by a "customer first" approach.*

36.     On July 16, 2014, the Company issued a release reporting its 2Q14 financial results for the interim period ended June 30, 2014, its first as an independent company.  The release emphasized in its title that "***Delinquency and Charge-Off Rates on Private Education Loan Portfolio [were] Down to Lowest Levels Since 2008***."  In addition to emphasizing in the release that "[t]he company's results show[ed] *a continued improvement in student loan portfolio credit quality* with 90-plus day delinquencies on its federal and private loan portfolio declining to the lowest levels since 2008," and reporting "[c]ore earnings for the quarter [of] $241 million ($0.56 diluted earnings per share)," the release quoted Defendant Remondi stating in pertinent part as follows:

> Navient's first earnings release demonstrates that strong financial performance and industry-leading customer success go hand in hand.  Our approach to loan servicing continues to help more customers successfully manage their student loan payments and avoid the consequences of default, as reflected in the improving credit quality of the loans we service.  As the leader in default prevention, we assisted 667,000 borrowers to pay off their student loans in full over the past year.  ***Looking ahead, Navient is well positioned to grow as more institutions turn to us for loan servicing and asset recovery solutions that focus on customer success and compliance.***

37.     Specifically referencing the purported performance improvements in the Company's Private Education Loans segment that permitted it to reduce its loan loss provision, the release stated in pertinent part as follows:

> **Private Education Loans**
>
> In the private education loans segment, Navient acquires, finances and services private education loans.
>
> Quarterly core earnings were $86 million compared with $61 million in the year-ago quarter.  The increase is primarily the result of a $44 million decrease in the provision for private education loan losses.
>
> Core earnings second-quarter 2014 private education loan portfolio results vs. second-quarter 2013 are as follows:
>
> - ***Delinquencies of 90 days or more of 3.2 percent of loans in repayment, down from 4.0 percent.***
>
> - ***Total delinquencies of 7.1 percent of loans in repayment, down from 8.4 percent.***

- ***Annualized charge-off rate of 2.5 percent of average loans in repayment, down from 3.0 percent***.

- Student loan spread of 4.10 percent, unchanged from the year-ago quarter.

- ***Provision for private education loan losses of $145 million, down from $189 million***.

- The portfolio balance, ***net of loan loss allowance***, was $30.3 billion, down from $31.8 billion.

38.     The release also discussed the capacity of the Company's secured credit facilities.  In this regard, the release stated, in pertinent part, that:

> As of June 30, 2014, March 31, 2014 and June 30, 2013, the maximum additional capacity under these facilities was $10.7 billion, $12.7 billion and $11.9 billion, respectively.  For the three months ended June 30, 2014, March 31, 2014 and June 30, 2013, the average maximum additional capacity under these facilities was $11.8 billion, $12.3 billion and $11.1 billion, respectively.  For the six months ended June 30, 2014 and 2013, the average maximum additional capacity under these facilities was $12.0 billion and $10.9 billion, respectively.

39.     The Company also held a conference call with investors on July 17, 2014 to discuss its 2Q14 results and to provide annual guidance.  During the conference call, Defendant Remondi emphasized that Navient's "***private loan segment continue[d] to benefit from improving credit metrics***," such that "***[d]elinquencies and defaults continue[d] to fall, hitting six-year lows and driving down credit costs***," and Defendant Chivavibul stated that the Company was then on track to achieve 2014 Core earnings of $2.05 per share.

40.     On July 18, 2014, the Company filed a registration statement on Form S-3 (Registration No. 333-197516) with the SEC registering for a future public offering of an unspecified amount of debt securities, shares of common stock, shares of preferred stock, warrants to purchase debt securities, common stock, preferred stock or units of two or more of those types of securities, and units from time (the "July 2014 Shelf Registration Statement").

41.     On August 1, 2014, Navient filed a Quarterly Financial Report on Form 10-Q with the SEC for the interim period ended June 30, 2014 (the "2Q14 10-Q"), which was signed by

- 14 -

Defendant Chivavibul and certified pursuant to the Sarbanes Oxley Act of 2012 by Defendants

Remondi and Chivavibul. The 1Q14 10-Q reiterated the financial results reported on July 16, 2014

and provided the following additional disclosures concerning the adequacy of Navient's "Allowance

for Loan Losses" and legal compliance:

> ***Our provisions for loan losses represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios.*** The evaluation of the provisions for loan losses is inherently subjective as it requires material estimates that may be susceptible to significant changes. ***We believe that the allowance for loan losses is appropriate to cover probable losses incurred in the loan portfolios.***
>
> *          *          *
>
> ***Navient prides itself in a robust compliance culture driven by a "customer first" approach.***

42.      On October 15, 2014, Navient issued a release announcing its 3Q14 financial results

for the period ended September 30, 2014. In addition to emphasizing in its headline that its

"***Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008,***"

the release further stated in pertinent part as follows:

> Navient . . . today released third-quarter 2014 financial results ***showing continued improvements in delinquencies and defaults since a year ago*** . . . .
>
> *          *          *
>
> "***This quarter again demonstrated improved credit performance***," said Jack Remondi, president and CEO, Navient. "***Private credit charge-offs set a new record low since 2008, and our education campaign assisted more federal and private loan customers to enroll in the repayment option that best meets their needs.***"
>
> *          *          *
>
> For the third-quarter 2014, ***GAAP net income was $359 million ($0.85 diluted earnings per share),*** compared with $260 million ($0.57 diluted earnings per share) for the year-ago quarter.
>
> ***Core earnings for the quarter were $218 million ($0.52 diluted earnings per share),*** compared with $259 million ($0.58 diluted earnings per share) for the year-ago quarter. The decrease in core earnings was the result of a $39 million reduction in asset recovery revenue, primarily related to a legislative reduction in certain fees earned effective July 1, 2014, as well as a $48 million reduction in net interest income, ***partially offset by a $47 million decrease in provisions for loan losses.***

43.     Specifically referencing the purported performance improvements in the Company's

Private Education Loans segment that permitted it to reduce its loan loss provision[2], the release

stated, in pertinent part, as follows:

**Private Education Loans**

In the private education loans segment, Navient acquires, finances and services
private education loans.

***Core earnings for the segment were $98 million in third-quarter 2014***, compared
with the year-ago quarter's $75 million, ***which is primarily the result of a $46
million decrease in the provision for private education loan losses***.

Core earnings third-quarter 2014 private education loan portfolio results vs. third-
quarter 2013 are as follows:

- ***Delinquencies of 90 days or more of 3.4 percent of loans in repayment,
  down from 4.2 percent.***

- ***Total delinquencies of 7.9 percent of loans in repayment, down from 9.8
  percent.***

- ***Annualized charge-off rate of 2.3 percent of average loans in repayment,
  down from 2.9 percent.***

- ***Student loan spread of 4.06 percent, down from 4.12 percent.***

- ***Provision for private education loan losses of $130 million, down from
  $176 million.***

The company acquired $848 million in private education loans in third-quarter 2014
for a total of $1.6 billion of private education loans acquired year to date.  At Sept.
30, 2014, Navient held $30.5 billion of private education loans.

44.     The release also discussed the capacity of the Company's secured credit facilities.  In

this regard, the release stated, in pertinent part, that:

As of September 30, 2014, June 30, 2014, and September 30, 2013, the maximum
additional capacity under these facilities was $11.0 billion, $10.7 billion and $11.2
billion, respectively.  For the three months ended September 30, 2014, June 30, 2014,
and September 30, 2013, the average maximum additional capacity under these
facilities was $10.8 billion, $11.8 billion and $11.4 billion, respectively.  For the nine
months ended September 30, 2014 and 2013, the average maximum additional
capacity under these facilities was $11.6 billion and $11.1 billion, respectively.

---

[2]     An allowance for loan losses is the measure of future loan payments that are expected to be
uncollectible and is established and maintained *via* a charge, which is also referred to as a
"provision," against a bank's operating income.

45.     On the morning of October 16, 2014, Navient held a conference call with investors and provided additional positive commentary about the Company's then-present business metrics, including the purported strong performance of its Private Education Loan segment that justified the reduction in the loan loss provision.  Emphasizing that Core earnings in the Private Education Loan "segment [had] increased $23 million from the year-ago quarter to $98 million," that "[p]rofitability continue[d] to improve as spreads remained consistent and losses continue[d] to decline," that "third quarter charge-offs were 2.3% which [was] a reduction from the prior quarter and the year-ago quarter," that Navient "continue[d] to see year-over-year improvement in both [its] total and 90 plus day delinquency rates," and that "[t]he improvement in [its] outlook for future charge-offs led to a decrease in [its] provision for loan losses, which came in at a $130 million for the quarter . . . a decrease of $46 million from the year-ago quarter."  Defendant Chivavibul raised 2014 annual guidance stating that the Company was then on track to achieve Core earnings of *$2.10* per share.

46.     Later in the call, Defendant Remondi again emphasized that "the improving economy ha[d] helped customers," that the Company was "seeing substantial declines in delinquency rates for . . . customers who [were] entering repayment for the first time," which was "true in both the federal and the private loan book," and that "[i]n the trend lines . . . in terms of dollars, it should be a continuing decline as you take those kind of combination of factors into consideration going forward."

47.     In response to a specific question about the ED's upcoming decision to renew its contingency collection contracts, Defendant Remondi engaged in the following colloquy with an investment research analyst, concealing that Navient's unscrupulous treatment of borrowers had been identified by the ED and was seriously jeopardizing its chances of securing a contract renewal:

<Q - Michael M. Tarkan>: Okay.  And then on the collection side, I know there has been delays in terms of when Department of Education is going to announce the new direct loan collection contract award.  Any update as to when that timing is going to

play out?  And then as a follow up, I know there is – sorry, 11 small business collectors this time around versus the five in the last contract.  So any sense as to how many collectors – how many unrestricted collectors they're planning on including under the new contract?

<A - John F. Remondi>: ***They've not provided any guidance on that***, but we are expecting an announcement soon.  It should be almost like any day, but it's been that way for a couple of weeks now.

48.     On October 30, 2014, Navient filed its Quarterly Financial Report on Form 10-Q with the SEC for the interim period ended September 30, 2014 (the "3Q14 10-Q"), which was signed by Defendant Chivavibul and certified pursuant to the Sarbanes Oxley Act of 2012 by Defendants Remondi and Chivavibul.  The 3Q14 10-Q reiterated the financial results reported on October 15, 2014 and provided the following additional disclosures concerning the adequacy of Navient's "Allowance for Loan Losses" and legal compliance:

> ***Our provisions for loan losses represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios***.  The evaluation of the provisions for loan losses is inherently subjective as it requires material estimates that may be susceptible to significant changes.  ***We believe that the allowance for loan losses is appropriate to cover probable losses incurred in the loan portfolios***.
>
> <div align="center">*        *        *</div>
>
> ***Navient prides itself in a robust compliance culture driven by a "customer first" approach.***

49.     On November 3, 2014, the Company filed a preliminary prospectus with the SEC indicating it intended to sell a still undisclosed amount of Senior Notes due 2020 and 2024 pursuant to the July 2014 Shelf Registration Statement, subject to a pricing amendment.

50.     On November 4, 2014, Navient filed a Pricing Term Sheet with the SEC indicating that the Senior Notes due 2020 and 2024 had received ratings from debt rating agencies of "Ba3/ BB/ BB, by Moody's/ S&P/ Fitch," and were being priced, respectively, at 99.365% and 99.075%.

51.     Also on November 4, 2014, Navient filed with the SEC a 2014 3rd Quarter Investor Deck dated November 4, 2014 that stated in pertinent part that Navient's "Provision for loan losses"

was $130 million for Q3 14, down from $145 million for Q2 14 and down from $176 million for Q3 13, and included additional slides that purportedly justified the large loan loss provision reduction recently taken by Navient that had increased the Company's reported Core Earnings and profits.

52.     On November 5, 2014, Navient conducted a public offering selling $500 million of its 5% Senior Notes due 2020 and $500 million of its 5.875% Senior Notes due 2024, raising more than $992 million in gross proceeds for the Company (the "November 2014 Debt Offering").  The November 2014 Debt Offering was underwritten by investment banking firms Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Barclays Capital Inc., Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated and RBS Securities Inc.  The final Prospectus filed with the SEC that day and used to conduct the November 2014 Debt Offering was false and misleading in that it materially overstated interest income, and thus Core Earnings and profits, by understating the loan loss provision required by the actual performance of the Company's Private Education Loan portfolio, and expressly incorporated by reference, among other things, the Information Statement filed in connection with the Spin-Off, the Forms 10-Q filed for the 1Q14 and 2Q14 and the press releases issued on April 16, 2014 and July 16, 2014.

53.     On November 13, 2014, Navient issued a press release announcing that it was purchasing a portfolio of federally guaranteed student loans from Wells Fargo totaling $8.5 billion in principal balance.

54.     On November 17, 2014, Navient issued a release "announc[ing] the closing of a new $10 billion student loan asset-backed commercial paper financing facility" maturing in November 2017, supported by Wells Fargo Bank, National Association; JPMorgan Chase Bank, N.A.; and Royal Bank of Canada; and arranged by Wells Fargo Bank N.A. that would "finance the acquisition

of federally guaranteed student loan portfolios, including a portion of the $8.5 billion transaction announced last week, as well as provide additional liquidity to the company."

55.     On the evening of January 21, 2015, after the close of trading, Navient issued a release announcing its 4Q14 and fiscal 2014 financial results for the period ended December 31, 2014. In addition to again emphasizing in its headline that its *"2014 Charge-Off Rates on Private Education Loan Portfolio Improve[d] to Lowest Levels Since 2008*," the release further stated, in pertinent part, as follows:

> Navient . . . today released fourth-quarter 2014 and full-year 2014 financial results that include $13 billion of student loan purchases during 2014 and *lower year-over-year charge-off rates on private education loans*.

> "2014 marked the successful launch of Navient as an industry leader in loan management, servicing and asset recovery," said Jack Remondi, president and CEO, Navient. "We enable millions of customers to successfully manage their education loan repayment, helping them capture the value of their higher education. Our customized outreach assisted a record 762,000 student loan customers in 2014 to enroll in income-driven or other alternative payment programs. *We continued to meet our commitment to create shareholder value as we* announced $13 billion in portfolio acquisitions and *realized year-over-year improvements in credit quality*. I'm proud of our 6,200 dedicated employees, who each and every day deliver results for our customers, clients and shareholders. *Looking ahead to 2015 — our first full year as Navient — we are ready to continue our track record of success*."

> For the fourth-quarter 2014, *GAAP net income was $263 million ($0.64 diluted earnings per share)*, compared with $270 million ($0.60 diluted earnings per share) for the year-ago quarter. For 2014, *GAAP net income was $1.1 billion ($2.69 diluted earnings per share)*, compared with $1.4 billion ($3.12 diluted earnings per share) for 2013.

> *Core earnings for the quarter were $217 million ($0.53 diluted earnings per share)*, compared with $274 million ($0.62 diluted earnings per share) for the year-ago quarter. Excluding expenses associated with regulatory matters, fourth-quarter 2014 and 2013 diluted core earnings per share were $0.54 and $0.70, respectively.

> *Core earnings for the year were $818 million ($1.93 diluted earnings per share)*, compared with $1.2 billion ($2.77 diluted earnings per share) for 2013. Excluding expenses associated with regulatory matters, 2014 and 2013 diluted core earnings per share were $2.10 and $2.85, respectively.

56.     Specifically referencing the purported performance improvements in the Company's Private Education Loans segment that permitted it to reduce its loan loss provision, the release stated, in pertinent part, as follows:

**Private Education Loans**

In its private education loans segment, Navient acquires, finances and services private education loans.

***Core earnings for the segment were $92 million in fourth-quarter 2014***, compared with the year-ago quarter's $86 million. ***This increase is primarily the result of a $24 million decrease in the provision for private education loan losses***.

Core earnings fourth-quarter 2014 private education loan portfolio results vs. fourth-quarter 2013 are as follows:

- ***Delinquencies of 90 days or more of 3.8 percent of loans in repayment, down from 4.7 percent.***

- ***Total delinquencies of 8.1 percent of loans in repayment, down from 9.3 percent.***

- ***Annualized charge-off rate of 2.5 percent of average loans in repayment, down from 3.3 percent.***

- ***Student loan spread of 3.99 percent, down from 4.04 percent.***

- ***Provision for private education loan losses of $128 million, down from $152 million.***

***Full-year core earnings for this segment were $351 million, compared with $269 million in 2013. This increase was primarily the result of a $183 million decrease in the provision for loan losses.***

The company acquired $11 million of private education loans in the fourth-quarter 2014 for a total of $1.6 billion of private education loans acquired during the full-year 2014. At Dec. 31, 2014, Navient held $29.8 billion of private education loans, compared with $31 billion of private education loans held at Dec. 31, 2013.

57.     The release also discussed the capacity of the Company's secured credit facilities. In this regard, the release stated, in pertinent part, that:

As of December 31, 2014, September 30, 2014, and December 31, 2013, the maximum additional capacity under these facilities was $13.2 billion, $11.0 billion and $10.6 billion, respectively. For the three months ended December 31, 2014, September 30, 2014 and December 31, 2013, the average maximum additional capacity under these facilities was $14.0 billion, $10.8 billion and 11.1 billion, respectively. For the years ended December 31, 2014 and 2013, the average maximum additional capacity under these facilities was $12.2 billion and $11.1 billion, respectively.

58.     On the morning of January 22, 2015, Navient held a conference call with investors and provided additional positive commentary about the Company's then-present business metrics,

including the purported strong performance of its Private Education Loan segment that supported

lowering the loan loss provision.  During his opening remarks, Defendant Remondi emphasized that

the Company then "[saw] continued opportunities to increase the expected cash flows from [its]

federal and *private loan portfolios as credit continue[d] to improve* and [Navient] benefit[ed] from

lower financing costs and low interest rates," and that it was "confident in [its] ability to generate

core earnings per share of *$2.20* in 2015 and to generate ongoing EPS growth in the years beyond."

Discussing the Private Education Loan segment during his opening remarks, Defendant Chivavibul

too emphasized that "Core earnings in this segment increased $6 million from the year-ago quarter to

$92 million," that "[p]rofitability continue[d] to improve as spreads remain[ed] consistent and losses

continue[d] to decline," that "[c]harge-offs for the fourth quarter were at 2.5%, which [was] a

significant reduction from the year-ago quarter," that the Company "continue[d] to see year-over-

year improvements in both [its] total and 90-plus day delinquency rates," that "[i]mprovement in

[Navient's] outlook for future charge-offs led to a decrease in [its] provision for loan losses, which

came in at $128 million for the quarter … a decrease of $24 million from the year-ago quarter," and

"reiterate[d] [its] core EPS guidance of $2.20 for 2015."

59.     On February 27, 2015, Navient filed its Annual Financial Report on Form 10-K with

the SEC for the interim period and fiscal year ended December 31, 2014 (the "2014 10-K"), which

was signed and certified under the Sarbanes Oxley Act of 2012 by the Individual Defendants.  The

2014 10-K reiterated the financial results reported on January 21, 2015 and provided the following

additional disclosures concerning the adequacy of Navient's "Provisions for Loan Losses" and legal

compliance:

> Management estimates and maintains an allowance for loan losses *at a level*
> *sufficient to cover charge-offs expected over the next two years, plus an additional*
> *allowance to cover life-of-loan expected losses for loans classified as a troubled*
> *debt restructuring ("TDR")*.  The provision for loan losses increases the related
> allowance for loan losses.  Generally, the allowance for loan losses rises when future

charge-offs are expected to increase *and falls when future charge-offs are expected to decline*. Our loss exposure and resulting provision for loan losses is small for FFELP Loans because we generally bear a maximum of 3 percent loss exposure on them. We bear the full credit exposure on our Private Education Loans. Our "Core Earnings" provision for loan losses in our FFELP Loans segment was $40 million in 2014 compared with $48 million in 2013. *Losses in our Private Education Loans segment are determined by risk characteristics, such as school type, loan status (in-school, grace, forbearance, repayment and delinquency), loan seasoning (number of months a payment has been made by a customer), underwriting criteria (e.g., credit scores), a cosigner and the current economic environment. Our "Core Earnings" provision for loan losses in our Private Education Loans segment was $539 million in 2014 compared with $722 million in 2013.*

<div align="center">*     *     *</div>

*Navient prides itself in a robust compliance culture driven by a "customer first" approach.*

60.     The 2014 10-K further disclosed that Navient's subsidiary, Pioneer Credit Recovery ("Pioneer"), which had provided asset recovery services on defaulted student loans to the ED, received no new account placements from the ED after Pioneer's collection contract expired on February 21, 2015.

61.     As disclosed in a March 2, 2015 report published by *Inside Higher Ed*, the ED was actually cancelling "contracts with five companies that collect defaulted federal student loans after finding they made 'materially inaccurate representations' to struggling borrowers." The *Inside Higher Ed* report further stated, in pertinent part, as follows:

> The five debt collectors being terminated, the department said, *provided borrowers with "inaccurate information at unacceptably high rates" about the benefits of a federal program that allows borrowers to get their loans out of default.*
>
> *"In particular, these agencies gave borrowers misleading information about the benefits to the borrowers' credit report and about the waiver of certain collection fees,"* the department said in a statement.

<div align="center">*     *     *</div>

> **Crackdown on Navient**
>
> The department's decision is a victory for a collation of student and consumer advocates, unions and some Senate Democrats who have been particularly critical of the agency's relationship with Navient, which was spun off last year from Sallie Mae.

The company last May paid $97 million to settle allegations by the federal government that it overcharged military service members.

"We are engaged with [the Department of Education] to learn more about their decision and address any questions or concerns they may have," Navient told investors on Friday.

*The company said that it had earned $65 million in revenue under the debt collection contract in 2014 and $62 million in 2013.*

Representative Chris Collins, a Republican who represents the upstate New York district where Navient-owned Pioneer Credit Recovery operates, told The Buffalo News that the decision to end the contract would lead to *the loss of about 400 jobs at the company*.

62.    On this news, the price of Navient common stock declined almost $2 per share from its close of $21.40 on February 27, 2015 to close at $19.51 on March 2, 2015 on unusually heavy trading volume of more than ten million shares trading.

63.    On March 2, 2015, Navient filed with the SEC a 2014 4th Quarter Investor Deck dated March 2, 2015 that stated in pertinent part that Navient's "Provision for loan losses" was now $128 million for Q4 14, down from $152 million for Q4 13, and down to $539 million for 2014, down from $722 million for 2013, and included additional slides that purportedly justified the large loan loss provision reduction recently taken by Navient that had increased the Company's reported Core Earnings and profits.

64.    On March 25, 2015, the Company filed a preliminary prospectus with the SEC indicating it intended to sell an undisclosed additional amount of Senior Notes pursuant to the July 2014 Shelf Registration Statement, subject to a pricing amendment.

65.    On March 25, 2015, Navient filed a Pricing Term Sheet with the SEC indicating that the Senior Notes due 2021 had received ratings from debt rating agencies of "Ba3/ BB/ BB, by Moody's/ S&P/ Fitch," and were being priced at 99.379%.

66.    On March 26, 2015, Navient conducted a public offering selling $500 million of its 5.875% Senior Notes due 2021, raising more than $492.5 million in gross proceeds for the Company

(the "March 2015 Debt Offering").  The March 2015 Debt Offering was again underwritten by investment banking firms Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Barclays Capital Inc., Goldman, Sachs & Co., and Merrill Lynch, Pierce, Fenner & Smith Incorporated, this time joined by Wells Fargo Securities, LLC.  The final Prospectus filed with the SEC that day and used to conduct the March 2015 Debt Offering was false and misleading in that it materially overstated interest income, and thus Core Earnings and profits, by understating the loan loss provision required by the actual performance of the Company's private education loan portfolio, and expressly incorporated by reference, among other things, the Information Statement filed in connection with the Spin-Off, the Forms 10-Q filed for the 1Q14 and 2Q14, the press releases issued on April 16, 2014 and July 16, 2014, and any other filings the Company made with the SEC prior to the completion of the offering.

67.     On the evening of April 21, 2015, after the close of trading, Navient issued a release announcing its 1Q15 financial results for the period ended March 31, 2015.  The release stated, in pertinent part, as follows:

> "We're pleased to begin our first full year as Navient *by helping more recent college graduates successfully transition into repayment,*" said Jack Remondi, president and CEO, Navient.  "*Private credit quality also continued to improve, leading to a lower loan loss provision*.  During the quarter, we continued to make investments to enhance our service to clients and customers, and we continue to deliver on our growth plan by welcoming Gila to our family of top-performing asset recovery firms, adding 600 clients and accelerating our growth in business process outsourcing."
>
> For the first-quarter 2015, *GAAP net income was $292 million ($0.72 diluted earnings per share)*, compared with $219 million ($0.49 diluted earnings per share) for the year-ago quarter.
>
> *Core earnings for the quarter were $194 million ($0.48 diluted earnings per share)*, compared with $142 million ($0.33 diluted earnings per share) for the year-ago quarter.

68.     Specifically referencing the purported performance improvements in the Company's Private Education Loans segment that permitted it to reduce its loan loss provision, the release stated in pertinent part as follows:

*Core earnings for the segment were $77 million in first-quarter 2015*, compared with the year-ago quarter's $74 million. *This increase is primarily the result of a $16 million decrease in the provision for private education loan losses*, a $6 million increase in servicing fees and a $9 million reduction in expenses. This was partially offset by a $26 million decrease in net interest income due to a decline in the net interest margin and the balance of the portfolio.

Core earnings first-quarter 2015 private education loan portfolio results vs. first-quarter 2014 are as follows:

- *Delinquencies of 90 days or more of 3.6 percent of loans in repayment, down from 3.9 percent.*

- *Total delinquencies of 6.9 percent of loans in repayment, down from 7.8 percent.*

- *Annualized charge-off rate of 2.9 percent of average loans in repayment, down from 3.3 percent.*

- *Net interest margin of 3.74 percent, down from 3.91 percent.*

- *Provision for private education loan losses of $120 million, down from $136 million.*

At March 31, 2015, Navient held $29.0 billion of private education loans, compared with $30.9 billion of private education loans held at March 31, 2014.

69.     The release also discussed the capacity of the Company's secured credit facilities. In this regard, the release stated, in pertinent part, that:

As of March 31, 2015, December 31, 2014 and March 31, 2014, the maximum additional capacity under these facilities was $12.5 billion, $13.2 billion and $12.7 billion, respectively. For the three months ended March 31, 2015, December 31, 2014 and March 31, 2014, the average maximum additional capacity under these facilities was $12.9 billion, $14.0 billion and $12.3 billion, respectively.

70.     On the morning of April 22, 2015, Navient held a conference call with investors and provided additional positive commentary about the Company's then-present business metrics, including the purported strong performance of its Private Education Loan segment. During his opening remarks, Defendant Remondi emphasized that "[o]n the credit front, [Navient] continue[d] to see delinquency rates and [its] outlook for future expected charge-offs on [its] private portfolio improve," highlighting that "the 90-day delinquency rate on [its] private loan portfolio fell to 3.6% at March 31 from 3.9% a year ago," and stating that Defendants "continue[d] to remain confident in

[their] ability to generate core earnings per share of $2.20 for the year." Discussing Private Education Loan segment results during his opening remarks, Defendant Chivavibul too emphasized that "Core earnings in this segment increased $3 million from the year-ago quarter to $77 million," that "first quarter charge-off[s] were 2.9% or $28 million lower than the first quarter of last year," that Navient "continue[d] to see year-over-year improvements in [its] forbearance, total delinquency, and 90 plus day delinquency rates," that "[t]he improvement in [its] outlook for future charge-offs led to a decrease in [its] provision for losses, which came in at $120 million for the quarter . . . a decrease of $16 million from a year-ago quarter," and reiterated that the Company still "expect[ed] core EPS to be $2.20 in 2015."

71.     On April 30, 2015, Navient filed its Quarterly Financial Report on Form 10-Q with the SEC for the quarterly period ended March 31, 2015 (the "1Q15 10-Q"), which was signed by Defendant Chivavibul and certified under the Sarbanes Oxley Act of 2012 by Defendants Remondi and Chivavibul. The 1Q15 10-Q reiterated the financial results reported on April 21, 2015 and provided the following additional disclosures concerning the adequacy of Navient's "Allowance for Loan Losses":

> ***Our provisions for loan losses represent the periodic expense of maintaining an allowance sufficient to absorb incurred probable losses, net of expected recoveries, in the held-for-investment loan portfolios***. The evaluation of the provisions for loan losses is inherently subjective as it requires material estimates that may be susceptible to significant changes. ***We believe that the allowance for loan losses is appropriate to cover probable losses incurred in the loan portfolios***.

72.     On May 1, 2015, Navient filed with the SEC a 2015 1st Quarter Investor Deck dated May 1, 2015 that stated in pertinent part that Navient's "Provision for loan losses" was now $120 million for 1Q 15, down from $128 million for Q4 14, and down from $136 million for Q1 14, and included additional slides that purportedly justified the demonstrably large loan loss provision

reduction recently taken by Navient that had increased the Company's reported Core Earnings and profits.

73.     The statements referenced above in ¶¶28-33, 35-39, 41-48, 51-52, 55-61, 63 and 66-72 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that an increased number of higher-risk Private Education Loan borrowers who had gone back to school during the recession and deferred repayment and whose repayment obligations had resumed during 2014 were not timely repaying their loans;

(b)     that the Company's financial results were artificially inflated due to the material understatement of Navient's loan loss reserves;

(c)     that the Company, through its collection subsidiary Pioneer, was engaged in unsound business practices including misleading struggling borrowers that was jeopardizing the Company's contingency collection contract with the ED;

(d)     that the Company's operating structure was bloated, resulting in inefficiencies carried over from the Spin-Off that would cost tens of millions of dollars to remediate;

(e)     that a significant portion of the Company's low-rate credit facilities were at risk of being reduced or eliminated and would cause the Company to face higher borrowing costs; and

(f)     that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and growth, including its ability to report Core earnings of $2.10 per share and $2.20 per share, respectively, in 2014 and 2015.

74.    On July 13, 2015, after the close of trading, Navient issued a press release reducing its Core earnings guidance to $0.40 per share for 2Q 2015, which had ended June 30, 2015, and to $1.85 per share for fiscal 2015, *a more than 15% cut*, citing, in large part, the poor performance of its Private Educational Loan portfolio, emphasizing that borrowers who returned to school during the recession deferred loan payments and had resumed payments *during fiscal 2014*. As a result, Navient disclosed that it would now be forced to *increase* its Private Education Loan portfolio loan loss provision to $191 million for the 2Q 2015 and to between $575 million and $600 million for fiscal 2015, diminishing Core earnings and profits.

75.    Detailing the factors that Navient said had primarily "driven" this decline in portfolio performance and its need to increase its loan loss provision, the release disclosed that "a segment of higher risk private education loan borrowers who returned to school during the recession deferred repayment on their existing loans and exited deferment status in 2014," stating that "[t]hese loans are experiencing unfavorable credit trends compared to loans that exited deferment in prior years." The release also disclosed that "loan balances exiting deferment increased to $2.5 billion in 2014, as compared to $1.8 billion in 2013 and $2.1 billion in 2012," and that "[a]s a result, the company increased its provision for these loans and now projects a private education loan loss provision of $191 million for the quarter and $575 to $600 million for the year."

76.    The release also disclosed that Navient was taking an approximately $29 million restructuring charge in the 2Q 2015 in order to "simplify and streamline its management structure," quoting Defendant Remondi disclosing that the "restructuring initiative reflect[ed] changes post-separation *to improve the operating efficiency and effectiveness of [Navient's] organization* . . . ."

77.     In response to this news, the price of Navient common stock plummeted, falling nearly $2 per share, ***approximately 11%***, from its close on July 13, 2015, on unusually heavy trading volume of more than 8.5 million shares traded.

78.     On August 24, 2015, Navient disclosed in a Form 8-K filed with the SEC that, as a follow up to a previously disclosed investigation by the Consumer Fraud Protection Bureau ("CFPB"), it recently received a letter from the CFPB stating that its Office of Enforcement was considering taking legal action against Navient regarding its disclosures and assessment of late fees. The Company further stated that it "continues to believe that its acts and practices relating to student loans are lawful and meet industry standards."

79.     In response to this disclosure, the price of Navient common stock fell 6.3% on August 24, 2015, to close at $13.06 per share, and then fell an additional 7.8%, to close at $12.04 on August 25, 2015, on unusually heavy trading volume.

80.     On September 29, 2015, the CFPB issued a report that was highly critical of student loan servicing companies, such as Navient.  The report, which was based on more than 30,000 comments by borrowers, discussed widespread problems with the companies that service student loans and recommended a number of reforms.

81.     Following the disclosure of this report, Navient common stock fell nearly 10%, falling from a close of $12.16 per share on September 28, 2015 to close at $10.96 per share on October 1, 2015.

82.     On October 20, 2015, the Company issued a release announcing its 3Q15 financial results for the period ended September 30, 2015.  Among other things, the release discussed the capacity of the Company's secured credit facilities, stating, in pertinent part, that:

> As of September 30, 2015, June 30, 2015 and September 30, 2014, the maximum additional capacity under these facilities was $10.1 billion, $11.5 billion and $11.0 billion, respectively.  For the three months ended September 30, 2015, June 30, 2015

and September 30, 2014, the average maximum additional capacity under these facilities was $11.0 billion, $12.2 billion and $10.8 billion, respectively. For the nine months ended September 30, 2015 and 2014, the average maximum additional capacity under these facilities was $12.0 billion and $11.6 billion, respectively.

83.     The statements referenced above in ¶82 were materially false and misleading when made because they misrepresented and failed to disclose that a significant portion of the Company's low-rate credit facilities were at risk of being reduced or eliminated and would cause the Company to face higher borrowing costs, which was known to Defendants or recklessly disregarded by them.

84.     Then, on December 28, 2015, the Company filed a report with the SEC on Form 8-K disclosing that the Federal Home Loan Bank of Des Moines was reducing the amount that Navient could borrow under its credit facilities. This move followed criticism from Senator Elizabeth Warren that government-sponsored banks, such as the Federal Home Loan Bank of Des Moines, should not be lending taxpayer-backed funds – whose use was intended to make homeownership more affordable – at favorable terms to student loan companies, especially when the savings were not being passed on to student loan borrowers.

85.     In response to this disclosure, and concern that Navient will now have to face higher borrowing costs, Navient's stock price fell 9%, from a previous close of $12.61 per share, to close on December 28, 2015 at $11.46 per share.

86.     On December 21, 2015, Standard & Poor's Rating Services ("S&P") issued a report revising its outlook on Navient to negative from stable and lowering its senior unsecured debt rating to 'BB-' from 'BB':

> "The outlook revision reflects Navient's significant unsecured debt maturities coming due over the next five years relative to its unencumbered assets, including $1.2 billion in 2016, $1.8 billion in 2017, and $2.8 billion in 2018," said Standard & Poor's credit analyst Matthew Carroll. "Lowering the senior unsecured debt rating reflects our expectation that Navient's tangible unencumbered assets, which were $9.9 billion as of Sept. 30, 2015, for the next several years likely will remain less than its outstanding unsecured debt, which was $15.8 billion as of the same date."

87.     The markets for Navient publicly-traded securities were open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Navient publicly-traded securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Navient publicly-traded securities relying upon the integrity of the market price of Navient publicly-traded securities and market information relating to Navient, and have been damaged thereby.

88.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Navient publicly-traded securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

89.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Navient's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Navient and its business, prospects and operations, thus causing the Company's publicly-traded securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's publicly-traded securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

90.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Navient, their control over, and/or receipt and/or modification of Navient's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Navient, participated in the fraudulent scheme alleged herein.

91.    In addition, the alleged improprieties noted herein enabled certain Company insiders to sell shares of the Company's stock during the Class Period at fraud-inflated prices to reap more than one million dollars in gross proceeds:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| CHIVAVIBUL | SOMSAK | 02/03/15 | 1,023 | $20.47 | $20,940 |
| | | 02/04/15 | 1,408 | $20.93 | $29,469 |
| | | 02/06/15 | 1,184 | $21.38 | $25,313 |
| | | | | | $75,722 |
| | | | | | |
| HYNES | TIMOTHY | 02/03/15 | 553 | $20.70 | $11,447 |
| | | 02/04/15 | 1,404 | $20.93 | $29,385 |
| | | 02/06/15 | 1,118 | $21.38 | $23,902 |
| | | 05/01/15 | 296 | $19.64 | $5,813 |
| | | | | | $70,547 |
| | | | | | |
| SHAPIRO | STEVEN | 11/7/14 | 31,575 | $20.25 | $639,393 |
| | | | | | |
| KANE | JOHN | 11/19/14 | 23,767 | $20.67 | $491,263 |
| | | 02/03/15 | 1,735 | $20.60 | $35,741 |
| | | 02/04/15 | 1,670 | $20.93 | $34,953 |
| | | 02/06/15 | 1,402 | $21.38 | $29,974 |
| | | | | | $591,931 |
| | | | | | |
| **Total** | | | | | $1,377,593 |

92.    Navient too cashed in, conducting the November 2014 and March 2015 Debt Offerings, selling more than $1.5 billion of debt at prices and terms augmented by securing corporate debt ratings based on materially over-stated business metrics and financial performance.

## LOSS CAUSATION/ECONOMIC LOSS

93.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Navient publicly-traded securities and operated as a fraud or deceit on Class Period purchasers of Navient publicly-traded securities. By failing to timely disclose, among other things, that: (i) the Company was under-reserving for loan losses that materially overstated the financial health and operating results of the Company's Private Educational Loan portfolio; (ii) the Company's operating structure was bloated; (iii) the Company was engaged in improper business practices; and (iv) a significant portion of the Company's low-rate credit facilities were at risk of being reduced or eliminated and would cause the Company to face higher borrowing costs, Defendants presented a misleading picture of Navient's business and prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Navient publicly-traded securities fell as the prior artificial inflation came out. As a result of their purchases of Navient publicly-traded securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

94.    Defendants' false and misleading statements had the intended effect and caused Navient publicly-traded securities to trade at artificially inflated levels throughout the Class Period, with its common stock reaching as high as $22.71 per share on December 23, 2014.

95.    As a direct result of the corrective disclosures detailed herein, the price of Navient publicly-traded securities fell significantly. These declines removed the inflation from the price of

Navient publicly-traded securities, causing real economic loss to investors who had purchased Navient publicly-traded securities during the Class Period.

96.     The declines in the price of Navient publicly-traded securities after these disclosures came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines in Navient publicly-traded securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Navient publicly-traded securities and the subsequent significant decline in the value of Navient publicly-traded securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

97.     At all relevant times, the markets for Navient publicly-traded securities were efficient markets for the following reasons, among others:

(a)     Navient publicly-traded securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Navient filed periodic public reports with the SEC and the NASDAQ;

(c)     Navient regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Navient claimed to be a well-capitalized and seasoned issuer able to utilize the more truncated Form S-3 registration statement for its Class Period debt offerings; and

(e)     Navient was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

98.     As a result of the foregoing, the market for Navient publicly-traded securities promptly digested current information regarding Navient from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of Navient publicly-traded securities during the Class Period suffered similar injury through their purchase of Navient publicly-traded securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

99.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Navient who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's publicly-traded securities during the Class Period.

103.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Navient publicly-traded securities. Plaintiff and the Class would not have purchased Navient publicly-traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

104.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Navient publicly-traded securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    The Individual Defendants acted as controlling persons of Navient within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Navient, and their ownership of Navient stock, the Individual Defendants had the power and authority to cause Navient to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

107.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

A.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 12, 2016

ROSENTHAL, MONHAIT & GODDESS, P.A.

Norman M. Monhait (Del. Bar No. 1040)
919 N. Market Street, Suite 1401
Wilmington, DE 19801
302/656-4433
nmonhait@rmgglaw.com

*Delaware Counsel*

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARY K. BLASY
CHRISTOPHER T. GILROY
58 South Service Road, Suite 200
Melville, NY  11747
631/367-7100
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mblasy@rgrdlaw.com
cgilroy@rgrdlaw.com

JOHNSON & WEAVER LLP
MICHAEL I. FISTEL JR.
40 Powder Springs Street
Marietta, Georgia 30064
770/200-3104
michaelf@johnsonandweaver.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
619/230-0063
frankj@johnsonandweaver.com
*Attorneys for Plaintiff*

DocuSign Envelope ID: B146DAC5-E657-44FA-8116-1B01534D6558

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Tore Heinz Markus JAGRELIUS, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the complaint and authorize its filing.

2.     I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.     I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 9/4/15 | 250 | 11.94 |
|  |  |  |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
|  |  |  |
|  |  |  |

5.     I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of February 2016.

DocuSigned by:

*Tore Heinz Markus JAGRELIUS*

Tore Heinz Markus JAGRELIUS